IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

DENNIS SNYDER and
AUDRA SNYDER,

                    Plaintiffs,

vs.                                                    Civil Case No. 08-4094-SAC

THE AMERICAN KENNEL CLUB,

                    Defendant.


MEMORANDUM AND ORDER

        This case comes before the court on the defendant's motion to dismiss the

second amended complaint or, in the alternative, for summary judgment (Dk. 40), and

on the plaintiff's motion for partial summary judgment (Dk. 44). The American Kennel

Club (AKC) is a national organization which regulates the breeding, registration and

showing of purebred dogs within the United States. Plaintiffs are not members of the

AKC, but are professional dog handlers who show dogs at AKC sanctioned events.

Plaintiffs allege that the defendant intentionally interfered with their existing and

prospective contracts by suspending them from participating in or showing dogs at AKC

sanctioned shows and sponsored shows based on false allegations of cruelty and

negligence, and that the defendant libeled them by publishing notices of their

suspensions in the AKC newsletter. Plaintiffs seek actual and punitive damages,

claiming that defendant's acts deprive them of their livelihood.

        Plaintiffs' motion contends that they are entitled to partial summary judgment

setting aside the AKC's findings that Dennis Snyder was guilty of cruelty and neglect

and that Audra Snyder was guilty of cruelty. Defendant's motion seeks dismissal of or summary judgment on all of plaintiff's claims. An evidentiary hearing was previously held on the plaintiffs' motion for a preliminary injunction, thus the court is quite familiar with the facts of this case. For the reasons set forth below, the court grants the defendant's motion for summary judgment and denies all other motions.

**Defendant's motion to dismiss**

Defendant's motion seeks to dismiss the Second Amended Complaint for failure to state a claim for relief, pursuant to Fed.R. Civ.P. 12(b)(6). In the alternative, it seeks summary judgment on all claims.

Rule 12(d) of the Federal Rules of Civil Procedure teaches that "if, on a motion under Rule 12(b)(6)...matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." This is such a case. Accordingly, this motion shall be treated as one for summary judgment and the court shall not determine whether the facts stated in support of the plaintiffs' claims in the second amended complaint are plausibly pleaded. *See Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007); *Robbins v. Oklahoma*, 519 F.3d 1242 (10th Cir. 2008).

**Summary Judgment Standard**

On summary judgment, the initial burden is with the movant to point out the portions of the record which show that the movant is entitled to judgment as a matter of law. *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.1992), *cert. denied*, 506 U.S. 1013 (1992). If this burden is met, the non-movant must set forth specific facts which would be admissible as evidence from which a rational fact finder

could find in the non-movant's favor. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir.1998). The non-movant must show more than some "metaphysical doubt" based on "evidence" and not "speculation, conjecture or surmise." *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Bones v. Honeywell Intern.*, 366 F.3d 869, 875 (10th Cir. 2004). The essential inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether the evidence is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In ruling on a motion for summary judgment, the nonmoving party's evidence "is to be believed, and all justifiable inferences are to be drawn in [that party's] favor." *Anderson*, 477 U.S. at 255. At this stage, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge..." *Anderson*, 477 U.S. at 255. However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' " *Matsushita*, 475 U.S. at 587. *See Pinkerton v. Colorado Dept. of Transp.*, 563 F.3d 1052, 1058 (10th Cir. 2009).

**Facts**

The events giving rise to this case occurred at an AKC sanctioned dog show presented by the Muskogee Kennel Club in Shawnee, Oklahoma on Memorial Day weekend in 2005.The majority of the facts stated below were presented as sworn testimony at a disciplinary hearing held on June 6 and 7, 2007, by the Northwest Trial Board of the AKC, in which Audra Snyder was charged with cruelty and Dennis Snyder

3

was charged with cruelty and neglect in relation to their handling of the dog, "Jag."[1]

Plaintiffs are experienced dog show handlers who intended to show a Golden Retriever called "Jag" on May 27- 30th, 2005, at the AKC sanctioned dog show presented by the Muskogee Kennel Club. Audra Snyder showed Jag on the first day, Friday the 27th, in Dennis Snyder's absence, but Jag did not win. Instead, a Golden Retriever ("Jimmy") whom Jag had never beaten, won the breed and the sporting group on Friday. The number one Golden Retriever ("Murphy") was also at the show.

Dennis Snyder arrived at the dog show on Friday evening and initially intended to show Jag on Saturday. On Saturday, both Audra and Dennis Snyder were showing dogs and were very busy. After Jag was groomed, Dennis asked Nick Nelson, a fifteen-year-old who was working for the Snyders that weekend, to put Jag on the grooming table inside the dog containment area in the back of the Snyder's rig, which was separated from the family's living quarters by a bathroom. The dog area could be seen from the living quarters if the bathroom doors were open. Whether the doors were open or closed at the relevant time is disputed, as are other controlling facts.

In accordance with Dennis Snyder's instructions, Nick Nelson carried the grooming table inside, put Jag on it, and attached him to a noose secured to an arm of the table. The Snyder's eleven-year-old son, Kyle, was in the living quarters at the time watching his three younger siblings, one of whom was seven months old. As Dennis Snyder left the rig, he instructed Kyle to keep an eye on Jag. Dennis Snyder and Nick Nelson then left to show other dogs. Nick was to check on Jag, or bring him to the show

---

[1]Many other facts have been established, but are not material to this motion.

4

ring when the time came.

Dennis Snyder testified that approximately five or six minutes after leaving the rig, he asked Donna Nelson to take a dog back to the trailer, and she did so. A minute or so later, Donna Nelson ran up to Dennis Snyder, who was at ring side, and told him about Jag. Upon hearing the news from Donna Nelson, Dennis Snyder immediately ran out of the exhibition hall. It is uncontested that Jag was left on the grooming table in a noose, without anyone in the dog containment area of the trailer to supervise him. Facts relating to Jag's physical condition thereafter are disputed.

Donna Nelson testified that when she took a dog back to the Snyder's trailer, as Dennis Snyder had requested, she saw Jag drooling, hanging "lifeless" from the noose on the back side of the grooming table. She shoved the dog she was attending into a crate, then worked to get the noose off Jag. When she finally succeeded, Jag dropped to the floor and did not move. She crawled underneath the table, felt Jag, and thought he was dead. She then ran to find Dennis Snyder and told him there was a dog down and that she did not think he was alive. Audra Snyder then came over and Donna told her that the dog was hanging lifeless from the noose and she thought it was dead.

Dennis Snyder testified that when he was ringside on Saturday, he learned that Jag had tough competition which he deemed to be unbeatable, so he decided not to show Jag for the remainder of the show. Sometime thereafter, Donna Nelson told him that a dog had fallen off the grooming table. He immediately ran from ringside to his trailer, opened the door, and saw Jag "standing there wagging his tail ready to go." The grooming table had fallen over, flat on its side. Dennis Snyder put Jag in his crate, but did not seek any assistance or consult a veterinarian for Jag because he did not believe

5

any medical care was necessary.

Audra Snyder testified that she was in the ring showing another dog at the time Dennis ran out, which she found to be unusual. When Dennis returned to the show building he told her that he had left because Jag had fallen off the grooming table, but that Jag was fine. Later that day, Donna Nelson stopped by, asked how Jag was doing, and told Audra that she had found Jag hanging from the grooming table noose and had gotten him down. Audra asked if Jag was okay and Donna replied "yes." Audra then told Donna not to say anything to anyone about how she had found Jag. Audra told Donna "don't say anything" because "the whole situation, it just sounds bad" and disclosure would harm the Snyders' reputation. Jt. Exh. B, p. 608. Audra did not seek any assistance or consult a veterinarian for Jag because she did not believe any medical care was necessary.

Donna Nelson further testified that later in the day, she asked Audra how Jag was doing and Audra told her that Jag was fine, and told her not to say anything to anybody. Donna believed her, "second guessing" her perception that Jag was dead when she found him hanging from the noose. Donna agreed to remain silent and did not inform the event committee about Jag's incident. She held the Snyders in high esteem and trusted Audra Snyder. After this conversation with Audra, Donna's 15-year-old son, Nick, told her Jag had heat exhaustion and she told him that was not the problem, stating that she had found the dog hanging from the noose in the Snyders' trailer. Nick was very upset and asked her not to talk about it.

Nick Nelson worked for the Snyders that weekend, holding and grooming dogs. He testified that Dennis Snyder ran from the ring approximately ten or fifteen minutes

after they had left Jag on the grooming table. When Dennis returned to the ring he told Nick that Jag had just become overheated and was doing fine. Nick's mother had told him that the dog was strangled and lifeless, and seemed "really upset."  At the hearing, Nick testified that when he returned to the Snyder's rig that day, alone, he saw the head of a dog which may or may not have been breathing, lying motionless in Jag's crate with white foam around its mouth. In an earlier written statement dated July 15, 2005, given to an investigator, Nick had said that he "caught a glimpse" of Jag that day in his crate, "breathing pretty heavy," meaning Jag was panting. He received $1500 from Janis Fonceca, the dog's owner, after he gave his statement to the investigator.

Jag was not shown the last three days of the show. Two other people testified that they saw Jag in his exercise pen after Saturday's incident and during the Shawnee Oklahoma show. Linda Wilson, a dog breeder who knew Jag by sight and whose trailer was parked next to the Snyders that weekend, testified that she saw Jag in his exercise pen on Sunday and Monday and he looked fine or normal. She recalled telling Jag goodbye in his exercise pen on Sunday before she left the dog show, because she knew Jag was going back to his owner after that show. She testified that she had seen Donna speak to Dennis then saw Dennis run out of the building. She immediately asked Donna what was going on, and Donna told her that a dog had jumped or fallen off the table, that the dog was okay, and that Dennis was going to check on him. She also testified that she had seen dogs pull over grooming tables "many times," but had never had a dog injured by doing so.

Kimber Shields, Linda Wilson's niece, also testified that she saw Jag on Sunday and Monday of the same dog show and he "appeared fine" to her. She testified that she

saw Donna Nelson speak to Dennis, saw Dennis run out of the building, then saw Donna speak to Nick. From their actions, she wondered if something was going on, so she went up to Nick and asked if everything was okay. Nick replied that a dog had jumped off the table in the trailer. Kimber asked if the dog was okay and Nick said he thought so. Kimber had no other conversation with either Donna or Nick Nelson during that show about the incident.

The Snyders left Shawnee, Oklahoma on Monday after the conclusion of the dog show, and arrived in Topeka late that evening. Audra Snyder testified that the next morning, as she was exercising Jag at Lake Shawnee by riding her bike with Jag tethered on a leash, a noise spooked Jag and he pulled her off her bike and ran away. The Snyders' assistant,  Holly Scott, testified that she saw Audra's swollen wrist and her scratched knee later in the day that Jag ran away, which Audra said had been caused by her fall. Audra and others searched for Jag on Monday, but he was not found. The Snyders organized a search team, notified Jag's owner and veterinarian and others that he was lost, then left that evening for a dog show in Colorado. Jag was never located.

Jag's owner, Janis Fonceca, sent out fliers about Jag and set up a web site called "Jag Come Home," which collected over $24,000.00 from donations during its first year of operation. Donna Nelson remained silent until she saw a flier, six weeks to two months after the incident, stating that Jag had run away. That flier offered a reward. Donna Nelson testified that she called the owner not because of any reward, but because she thought she knew what had actually happened to Jag. She told Janis Fonceca how she had found Jag. The owner later sued the Snyders in state court, alleging that they had failed to obtain necessary veterinary assistance for Jag, had

8

disposed of Jag or his carcass, and then had attempted to cover up their conduct with the false claim that Jag had run away. That case settled before trial.

Janis Fonceca also filed a complaint against the Snyders with the AKC. She testified at the disciplinary hearing that she had called the Snyders regarding another dog on Saturday the 28th, at which time Dennis told her he was considering pulling Jag from competition on Sunday and Monday. She was "shocked" because the Snyders and she had agreed Jag would be shown all that weekend and in Colorado the following week, and the Snyders were paid only if they exhibited the dog. She believed that there was no reason to pull Jag, but told Dennis to do what he had to do. The Snyders never mentioned the grooming table incident to her, and she was unaware of it until Donna Nelson called her.

The AKC investigator, Jack Norton, took statements from Donna Nelson and Nick Nelson. He recorded their statements but did not record the statements which he obtained from Audra Snyder and Dennis Snyder. Mr. Norton testified that he made contemporaneous notes during the interview with the Snyders, then lost or misplaced those notes. Mr. Norton never interviewed any of the Snyders' witnesses, but got written statements from the two witnesses noted by the Snyders, Ms. Wilson and Ms. Shields.

Prior to his employment with the AKC, Mr. Norton worked for Tom Glassford, a field representative for the AKC, both in the Glassford home and conditioning dogs Tom Glassford was personally showing. He also attended dog shows with Tom Glassford. Field representatives provide show committees, exhibitors, breeders, judges and novices with information regarding AKC rules, regulations, policies and procedures. After each show, the AKC field representative forwards to AKC headquarters a report

9

showing the name of the dog, the breed of the dog, the owner of the dog, and the handler of the dog. Field representatives have a close working relationship with members of the AKC board of directors. The Snyders have seen Tom Glassford having dinner with members of the board on a number of occasions.

Tom Glassford is a good friend of Dennis Snyder's former wife, Emily Murphy, and had a longstanding relationship for a number of years with her. They have attended dog shows together over the years. Dennis Snyder and Emily Murphy had a very acrimonious divorce which was finalized in 1993, during which time Tom Glassford took Emily's side. Tom Glassford was also instrumental in a previous AKC disciplinary action against Dennis Snyder, in which Dennis Snyder was found guilty of misconduct for having put bands on the teeth of a dog he was showing. Dennis Snyder received a five-year suspension for that misconduct, but others charged with such misconduct received suspensions for as little as six months.

The AKC subsequently brought charges against the Snyders based upon the incident with Jag. The AKC has no rule expressly prohibiting dog show handlers from leaving a dog on a grooming table without supervision. Dennis Snyder and Audra Snyder were each charged with cruelty in failing to seek or provide appropriate medical attention for Jag while at the Shawnee, Oklahoma dog show on or about May 28, 2005. Dennis Snyder was additionally charged with neglect for leaving Jag on a grooming table without providing appropriate supervision to preclude the dog from being injured.

On June 6 and 7, 2007, a hearing on those charges was held in Topeka by the Northwest Trial Board of the AKC.  All parties were provided with notice and opportunity to be heard. During the two-day hearing, the Snyders were represented by counsel,

10

both sides presented evidence, and various witnesses testified and were cross-examined. The Trial Board thereafter sustained the charges, suspended the Snyders from all AKC privileges for ten years, and fined each of them $2,000.00.[2] On June 13, 2007, the Snyders appealed the Northwest Trial Board's decision, but the AKC Appeal Trial Board sustained the decision of the Northwest Trial Board in all respects.

The AKC's decision was published in the AKC Gazette's October, 2007 edition, which stated, among other notices, the following:

NOTICE

On June 6 and 7, 2007, the Northwest Trial Board of the American Kennel Club heard charges against Mr. Dennis Snyder for cruelty and neglect in connection with a dog at the Muskogee Kennel Club's May 2005 event. The Trial Board sustained the charges and suspended Mr. Snyder from all AKC privileges for ten years and imposed a $2,000.00 fine, effective June 20, 2007.

On June 13, 2007, Mr. Snyder appealed the Northwest Trial Board decision. The Appeal Trial Board sustained the decision of the Northwest Trial Board in all respects.

NOTICE

On June 6 and 7, 2007, the Northwest Trial Board of the American Kennel Club heard charges against Mrs. Audra Snyder for cruelty in connection with a dog at the Muskogee Kennel Club's May 2005 event. The Trial Board sustained the charges and suspended Mrs. Snyder from all AKC privileges for ten years and imposed a $2,000.00 fine, effective June 20, 2007.

On June 13, 2007, Mrs. Snyder appealed the Northwest Trial Board decision. The Appeal Trial Board sustained the decision of the Northwest Trial Board in all respects.

---

[2]Although a ten year suspension strikes this Court as being disproportionately long, that is the "standard" penalty for the offense of cruelty pursuant to the AKC Discipline Guidelines, rather than the penalty for a mitigated or an aggravated offenses. *See* Jt. Exh. Vol I, No. 23, p. 1.

This suit followed. Other uncontested facts are stated in the opinion, as necessary.

**Plaintiff's motion for partial summary judgment**

Because this case arises under the federal court's diversity jurisdiction, the law governing the plaintiffs' causes of action is the law that would be applied if the case had been brought in Kansas state court. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Butt v. Bank of Am., N.A.*, 477 F.3d 1171, 1179 (10th Cir. 2007). In Kansas, tortious interference claims and defamation claims are governed by the law of the state where the wrong was felt. *Ling v. Jan's Liquors*, 237 Kan. 629, 634, 703 P.2d 731, 735 (1985). Where the alleged wrong to plaintiffs involves financial harm, the court looks to the state in which plaintiffs felt that financial injury. *See Lawrence-Leiter & Co. v. Paulson*, 963 F.Supp. 1061, 1065 (D.Kan.1997) (defamation); *St. Paul Furniture Mfg. Co. v. Bergman*, 935 F.Supp. 1180, 1187 (D.Kan.1996) (tortious interference). Because the plaintiffs are Kansas residents, any financial or reputational injury they suffered from the alleged torts would have been felt here, thus these claims are governed by Kansas substantive law.

**Review of ACK's findings**

Plaintiffs' partial summary judgment motion[3] seeks to set aside the AKC's findings that Dennis Snyder was guilty of cruelty and neglect and that Audra Snyder was guilty of cruelty. Before examining the facts relating to this motion, the court detours to note why it finds this motion to be appropriate, despite the absence of any separate

---

[3]Plaintiff has properly supported most of the facts stated in its memorandum with specific references to the record. The court has disregarded, however, any citation to the "complaint" that is not additionally supported by citation to the record. *See* D.Kan.R. 56.1(d).

claim in the second amended complaint seeking judicial review of the AKC's findings of cruelty and neglect.[4]

The second amended complaint alleges only two claims: one for intentional interference with contract and/or prospective business advantage, and another for libel. But "both tortious interference with a contract and tortious interference with contractual expectations or a prospective business advantage are predicated on malicious conduct by the defendant." *Turner v. Halliburton Co.*, 240 Kan. 1, 12, 722 P.2d 1106 (1986).

The same is true for the plaintiffs' claim of libel. Under Kansas law, even where all of the necessary elements of libel are shown, see *Luttrell v. United Telephone System, Inc.*, 9 Kan.App.2d 620, 620-21, 683 P.2d 1292 (1984), *aff'd* 236 Kan. 710, 695 P.2d 1279 (1985), a qualified privilege may render the communication legal and be defeated only by a showing of malice.

> A communication is qualifiedly privileged if it is made in good faith on any subject matter in which the person communicating has an interest, or in reference to which he has a duty, if it is made to a person having a corresponding interest or duty....
> Generally, whether a publication is qualifiedly privileged is a question of law to be determined by the court.

*Senogles v. Security Benefit Life Ins. Co.*, 217 Kan. 438, syl. 3-4, 536 P.2d 1358 (1975).

Kansas recognizes a qualified privilege with respect to "business or employment communications made in good faith and between individuals with a corresponding interest or duty in the subject matter of the communication." *Turner*, 240 Kan. at 8.

---

[4]Although the original complaint (Dk. 1, Att. 1) claimed a "due process" violation by the AKC and sought reversal of its "arbitrary and capricious" decision, those claims are omitted from the second amended complaint, and no claim in the nature of administrative review, whether under N.Y. Article 78 or otherwise, is included in it. *See* Dk. 44, p. 24 and following, where the plaintiffs so admit.

Similarly, Kansas has recognized a qualified privilege for the executive committee of a voluntary association who published facts of the suspension and expulsion of a member, even where the matter was incidentally brought to the attention of non-members. *Burton v. Dickson*, 104 Kan. 594,180 P. 216, 217 (1919). *See also Redgate v. Roush*, 61 Kan. 480, 59 P. 1050 (1900) (finding qualified privilege for church members' publication that their pastor was unfit for his office).

The court finds that a qualified privilege protects the challenged acts[5] of the AKC in this case, as long as they were done without malice. The AKC's stated objects are broad, and include:

> ...to adopt and enforce uniform rules regulating and governing purebred dog events, to regulate the conduct of persons interested in ... exhibiting and running purebred dogs, to prevent, detect, and punish frauds in connection therewith, to protect the interests of its members, to publish an official kennel gazette, and generally to do everything to advance the study, breeding, exhibiting, running and maintenance of purebred dogs.

Jt. Exh. Vol. II, O, p. 4. The AKC has a legitimate interest in enforcing its rules relating to purebred dogs and purebred dog shows, and its charges and publication of its discipline of the plaintiffs to the dog show community were limited in scope to upholding that interest. *See Abbott v. Harris Publications, Inc.*, 2000 WL 913953, 7 (S.D.N.Y. 2000) (finding a publication which questioned the honesty an applicant to judge AKC-sanctioned dog shows to be a matter of legitimate public concern to the "dog show community," protected by qualified privilege); *Rodger v. American Kennel Club,* 138 Misc. 310, 320 (1930) (finding AKC's publication of a dog owner's suspension to be

---

[5]"Occasions privileged under the law of defamation are also occasions in which interference with contractual relations may be considered justified or privileged." *Turner*, 240 Kan. at 13, 722 P.2d 1106.

qualifiedly privileged because it was important to "dog fanciers in general" and was not malicious.)

By virtue of the qualified privilege, the AKC is protected from the threat of defamation suits by an enhanced burden of proof which requires the plaintiff to show "not only that the statements were false, but also that the statements were made with actual malice- with actual evil-mindedness or specific intent to injure.' " *Turner*, 240 Kan. at 8, 722 P.2d 1106 (quoting *Munsell v. Ideal Food Stores*, 208 Kan. 909, 920-21, 494 P.2d 1063 (1972)).The court recognizes that issues of a defendant's motive and the presence or absence of malice are typically questions for the jury. *See Hutchinson v. Proxmire*, 443 U.S. 111, 120 n. 9, 99 S.Ct. 2675, 2680 n. 9, 61 L.Ed.2d 411 (1979); *Burcham v. Unison Bancorp, Inc.*, 276 Kan. 393, 425, 77 P.3d 130, 152 (2003). Here, however, cross-motions for summary judgment ask the court to decide whether malice is shown as a matter of law, as the plaintiffs contend, or whether the absence of malice is shown as a matter of law, as the defendant contends.

Accordingly, despite the absence in the second amended complaint of a separate claim for judicial review of the AKC's decision, the court shall examine the merits of the plaintiff's motion for partial summary judgment to review whether the AKC's acts were, as a matter of law, malicious and not justified, as relevant to plaintiffs' Kansas tort claims. Doing so demands a review of the disciplinary proceedings before the AKC.

### Interference and libel claims - malice

Plaintiffs contend that defendant's interference with their contracts and prospective contracts is malicious for three reasons: 1) because the AKC failed to follow

15

its own rules pertaining to discipline arising out of incidents which occur at sanctioned

dog shows; 2) because the AKC's investigator was biased against them and failed to

keep and preserve audio tapes and notes of his interviews with the plaintiffs and failed

to contact any of the witnesses who could testify that Jag was alive and was not injured

at the Shawnee, Oklahoma dog show; and, 3) because the AKC knew that the charges

were unsupported by any evidence.

The same facts are alleged in support of the plaintiff's claim that the notices

published in the AKC Gazette were false. Plaintiffs contend the published information

was false because they did not commit any act of cruelty or neglect in connection with

Jag at the stated dog show. Rather, Jag knocked the grooming table over, was not

seriously injured, needed no care or treatment by a veterinarian, and was lost soon

thereafter.

### Procedural irregularity

The court first examines the plaintiffs' contention that the AKC failed to follow its

own rule requiring that each incident be investigated by the local Event Committee. It is

uncontested that the local Event Committee of the Muskogee Kennel Club did not

investigate the incident involving Jag, and that the incident was first investigated by the

national AKC.

The Charter and Bylaws of the AKC state that the Event Committee of a club or

association shall have "the right and responsibility" to suspend any person from AKC

privileges for conduct prejudicial to the best interests of purebred dogs, purebred dog

events, or the AKC alleged to have occurred in connection with or during the progress

of its event, after the alleged offender has been given the opportunity to be heard.

16

Article XIV. The AKC pamphlet "Dealing With Misconduct at American Kennel Club Events: Guide to Event Committees," at Section II, states: "It is the duty of the [events] committee, not of the AKC, to deal initially with acts of alleged prejudicial conduct which occur during or in connection with a club's event. The phrase 'in connection with' means any incident where the parties there are involved because of the event." At Section V, the same pamphlet specifically states: "When a dog is seriously injured or dies in connection with an event, the Event Committee must conduct a preliminary investigation to determine if negligence or the willful conduct of an individual caused the injury or death." Vol II, Exhibit Q, page 6. It is uncontested that no complaint was ever filed against either Dennis Snyder or Audra Snyder with the Muskogee Event Committee.

Here, there is no allegation that any person filed a written complaint which would have triggered the Event Committee's duty to investigate. *See id*, p. 5. In fact, the record fails to show any notice whatsoever to the Event Committee of any incident involving Jag, let alone a complaint that Jag was seriously injured or died, thus the Event Committee had no opportunity to conduct a preliminary investigation.

The fact that the Event Committee did not investigate does not, however, preclude the AKC from doing so. The AKC's bylaws provide that any person may send to the AKC a written and sworn complaint against any other person for conduct alleged to have been prejudicial to the best interests of purebred dogs. Jt. Exh. Vol. II, O, p. 14. Upon receipt of such a complaint, the President of the AKC's Board of Directors "shall cause the matter to be investigated." *Id*, p. 15. The President or the Board of Directors "shall have the power to investigate any matters which may be brought to their attention in connection with the objects for which the AKC was founded..." *Id.* The President has

17

the power to prefer charges against any "person or persons, for conduct alleged to be prejudicial to purebred dogs, purebred dog events, or to the best interests of the AKC." *Id.* The AKC thus has concurrent jurisdiction to receive and investigate complaints such as the one against these plaintiffs. The AKC's investigation and bringing of charges against the plaintiffs without a prior investigation by the local Event Committee is not *ultra vires* and does not tend to show malice. Nothing indicates that the Event Committee's failure to investigate, the AKC's decision to investigate, or other acts[6] were motivated by any malicious or improper intent, such as to hinder an immediate investigation of the facts or to obstruct the preservation of evidence.

**Suspicious Investigation**

Plaintiffs next point to the investigation and investigator as suspect. They allege that the AKC staff investigator failed to keep and preserve audio tapes and notes of his interviews with the plaintiffs; failed to contact any of the witnesses who could testify that Jag was alive and was not injured at the Shawnee, Oklahoma dog show; and bore personal animosity or bias against the Snyders due to past contacts.

Even assuming the truth of these assertions, no malice is shown. The investigator's interviews of the plaintiffs were mere precursors to the charges filed against them. The plaintiffs had notice of the charges and a full and fair opportunity to testify at the hearing, and did so, rendering it immaterial if audio tapes of their previous statements to the investigator were not preserved. Similarly, the investigator's failure to

---

[6]Plaintiffs additionally contend that procedural irregularity is shown by the Trial Board's refusal to consider their written motion to dismiss, but the court does not agree that either the Trial Board's by-laws or the incorporated Roberts Rules of Order require the Trial Board to do so.

contact witnesses during the investigation who could verify the Snyders' statements that Jag was alive and not injured is immaterial because those very witnesses, Linda Wilson and Kimber Shield, appeared and testified at the hearing before the Trial Board. These persons, the only two witnesses whose names and addresses were provided by the Snyders to the investigator, testified that they saw Jag alive and seemingly well on Sunday and Monday, following the Saturday incident.

Plaintiffs also point to the investigator's friendship with AKC board members and with Dennis Snyder's ex-wife, to the investigator's involvement in a prior AKC disciplinary matter against Dennis Snyder, and to similar matters, apparently in an attempt to show bias or personal animosity against the Snyders. But the investigator was not among the decision-makers at the hearing or on appeal, and no evidence that he influenced the decision in any manner has been offered. No malice in the AKC's investigation has been shown, as a matter of law.

**Knowledge of falsity**

Lastly, the plaintiffs contend that malice is shown because the AKC knew that the charges were false and lacked any basis in fact. Plaintiffs state that no evidence of cruelty or negligence was in fact presented to the Trial Board. Plaintiffs contend that if the Trial Board believed the testimony of the Snyders and their witnesses, then Jag was not injured during the grooming table incident. If, on the other hand, the Trial Board believed the Nelsons' testimony instead of the Snyders' testimony, then Jag was already dead when the Nelsons saw him. In either case, they argue, no veterinarian care was necessary or appropriate, so the charge of cruelty has no basis in fact.

The AKC has adopted the following definitions of the charged offenses:

19

CRUELTY: Conscious action or inaction that may endanger life or cause serious health consequences to animals;

NEGLECT: Inadequate care or voluntary inattention to basic needs, ignoring the safety and well being of animals because of haste or ignorance.

In contending that the Trial Board knew the plaintiffs did not commit any act of cruelty, the plaintiffs presume that the Trial Board had to accept all of the testimony presented in the plaintiffs' favor while rejecting all other evidence, or had to accept the entirety of the testimony presented against the plaintiffs while rejecting all other evidence. But the Trial Board is not so constrained in its determination of the facts. The Trial Board was the judge of the credibility or "believability" of each witness and the weight to be given to their testimony, so was free to accept or reject the testimony of any witness in whole or in part.

The record contains sufficient evidence to support a finding of cruelty in the event the Trial Board believed certain testimony offered by both parties. The Trial Board could have credited Donna Nelson's testimony that she found Jag hanging from his noose, that Jag appeared to be lifeless when she found him, that although Donna Nelson thought Jag was dead he was not, that Jag was foaming at the mouth and panting in his kennel later that day when seen by Nick Nelson, that Jag was still alive two days later, as confirmed by Kimber Shields and Linda Wilson, but subsequently died from injuries received as a result of the grooming table incident, and that the Snyders falsely claimed that Jag had been lost. Alternatively, the Trial Board could have credited the Nelson's testimony that Jag appeared to be dead when found by Donna Nelson, was alive and foaming at the mouth and panting after the event when seen by Nick Nelson, and died soon thereafter, discrediting the testimony of Kimber Shields and

20

Linda Wilson who said they saw Jag alive on Sunday and Monday. If Jag was alive but injured even for only a few minutes after Dennis Snyder saw him, failure to call a veterinarian could be deemed cruelty, under the relevant definition. The Trial Board could have found, based upon the evidence presented, that Dennis Snyder knew Jag had survived a fall from his grooming table, had hanged himself by his noose for up to fifteen minutes causing him to foam at the mouth and appear to be lifeless, but told others Jag was merely overheated. Under those facts, his failure to provide veterinary care would constitute conscious inaction that could have serious health consequences to the dog, *i.e.*, cruelty.

Similarly, the basis for the charge of cruelty against Audra Snyder was that she knew that Jag had fallen off the grooming table, had hanged himself by his noose, appeared to be lifeless but survived, but instead of seeking veterinary care for Jag, she told people the dog was fine and affirmatively secured Donna Nelson's agreement not to tell others what she had seen. This too constitutes conscious action or inaction that could have serious health consequences to the dog.

The Trial Board expressly found that the Snyders' testimony lacked credibility, and this court finds reasonable inferences from facts, which taken together, support, but do not compel such a conclusion. First, the circumstances surrounding the Snyder's decision not to show Jag the last three days of the show are suspect. It is uncontested that the Snyders initially intended to show Jag all four days of the show, but they showed him only the first day and not after the grooming table incident. Dennis Snyder testified that he decided not to show Jag sometime after he left Jag on the grooming table on Saturday morning, but before Donna Nelson ran up to him, which by his own

21

account was only six or seven minutes later. His given reason for deciding not to show Jag the last three days was because he learned about the presence and strength of Jag's competition, but this was a fact which Audra knew about on Friday and that Dennis Snyder could easily have discovered from her before Jag was groomed on Saturday. Secondly, Dennis Snyder told Nick Nelson that Jag was overheated, but at the hearing he testified that immediately after the incident Jag was just "standing there wagging his tail ready to go." No mention was made of any indicia of overheating. Additionally, Audra Snyder admitted that she asked Donna Nelson not to tell anyone how Donna had found Jag because the situation "sounded bad." At that point, Audra Snyder appeared to believe and not refute Donna Nelson's account that Jag was dead or seriously injured. Lastly, the circumstances regarding Jag's running away are curious in that no one but the Snyders testified to having seen Jag either at the public park where he was reportedly lost, or at any time after the dog show, and the Snyders left for Colorado soon after Jag was reportedly lost.  The implausibility of the timing and basis for the Snyder's decision not to show Jag after Friday, the inconsistency in Dennis Snyder's descriptions of Jag's condition, Audra Snyder's admitted cover up of Donna Nelson's account of the incident involving Jag, and the timing and circumstances of Jag's disappearance all support the Trial Board's findings.

The court agrees with the plaintiffs that the record also provides several good grounds upon which to impeach Donna Nelson's testimony: 1) despite her eight years of showing dogs at AKC events, she did not report the incident to the Event Committee even though she thought Jag was dead; 2) she described Jag's condition as okay to both Audra Snyder and Linda Wilson, on the day the incident occurred; 3) she agreed

not to tell others about Jag's condition and did not tell others about it; and 4) she broke her silence only after learning that a monetary reward was offered for information. Similarly, Nick Nelson's testimony was not free from internal contradiction or change over time, and he received a monetary reward for his information.

Nonetheless, the Trial Board knew that certain testimony against the Snyders may have been self-contradictory, impeached by prior testimony, or motivated by financial gain, but found this to be unpersuasive. Those factors properly influence the Trial Board's credibility determinations but do not compel a finding by this court that any person's testimony was or was not credible as a matter of law, or that any one person's testimony must have been credited or discredited in toto. "Credibility determinations [and] the weighing of the evidence ... are jury functions, not those of a judge." *Stinnett v. Safeway, Inc.*, 337 F.3d 1213, 1216 (10th Cir. 2003). A summary judgment motion does not empower a court to act as the jury and determine witness credibility, weigh the evidence, or choose between competing testimony. *Windon Third Oil and Gas v. Federal Deposit Ins.*, 805 F.2d 342, 346 (10th Cir.1986), *cert. denied*, 480 U.S. 947 (1987). Accordingly, the court cannot agree that the evidence, taken in the light most favorable to the defendant, raises a material question of fact that the AKC knew that the charges of cruelty were false, lacking any basis in fact, or malicious.[7]

In recognition of the fact that it was not Audra Snyder's decision to leave Jag in the trailer on a grooming table in a noose, the AKC did not charge her with negligence. Plaintiffs contend that the charge of negligence against Dennis Snyder cannot be

_____

[7]Had the court's task been to determine whether the Trial Board's findings were arbitrary and capricious, the court would have found they were not.

upheld because AKC rules do not expressly prohibit the practice of leaving dogs on grooming tables without supervision, and it is commonly done. The record does include the statement of Dr. Robert Myall, one of the Trial Board judges, that he had heard of dogs falling off grooming tables and injuring themselves, but the record does not support the plaintiffs' assertion that leaving dogs unattended on grooming tables is a commonly accepted practice.

The record contains sufficient evidence of negligence based on the undisputed evidence that Dennis Snyder knowingly left Jag in the trailer on a grooming table in a noose, unattended, for at least six or seven minutes. The Trial Board could reasonably have found that Dennis Snyder's asking fifteen-year-old Nick to check on Jag, knowing the other demands Dennis Snyder imposed on Nick's time, and his asking eleven-year-old Kyle to keep an eye on Jag, knowing Kyle was in another room and was also charged with watching his three younger siblings, including an infant, were inadequate preventive or supervisory measures. Under these circumstances, it was reasonably foreseeable that Jag could be injured. Such an act falls within the plain meaning of the relevant definition of negligence, *i.e.*, "inadequate care or voluntary inattention to basic needs, ignoring the safety and well being of animals because of haste or ignorance." That some other persons have also left dogs unattended on grooming tables on occasion does not compel a finding of no negligence.

Plaintiffs have thus failed to show that the record presented to the Trial Board, taken as a whole, and read in the light most favorable to the defendant, could not persuade a rational trier of fact to find for the defendant. No malice has been shown as a matter of law.

24

**Defendant's Motion**

    **Interference with contract/prospective contractual advantage**

Defendants seek summary judgment on the plaintiffs' claim that by suspending them from their ability to participate in AKC sanctioned shows and sponsored shows, and by preventing them from showing dogs owned by their clients at these shows, the AKC wrongfully, intentionally, and without justification, interfered with plaintiffs' employment contracts with their clients, as well as with their prospective business relationships with existing and future clients. Defendant alleges that plaintiffs have failed to show an existing, enforceable contract with anyone.

> " 'The elements essential to recovery for tortious interference with a contract are: (1) the contract; (2) the wrongdoer's knowledge thereof; (3) his intentional procurement of its breach; (4) the absence of justification; and (5) damages resulting therefrom.' " *Dickens v. Snodgrass, Dunlap & Co.*, 255 Kan. 164, 168-69, 872 P.2d 252 (1994) (quoting 45 Am.Jur.2d, Interference § 39, p. 314).

*Burcham*, 276 Kan. at 423.

> A claim for tortious interference with a contractual relationship requires the existence of a valid and enforceable contract at the time of the interference between the plaintiff and a third party. Prosser & Keeton, Law of Torts § 129, p. 994 (5th ed.1984). *See Noller v. General Motors Corp.*, 244 Kan. 612, 619, 772 P.2d 271 (1989).

*Macke Laundry Service Ltd. Partnership v. Mission Associates, Ltd.*,19 Kan.App.2d 553, 561, 873 P.2d 219, 225 (1994).

The basis for the plaintiffs' allegation that the defendant knew of its contracts and prospective contracts is that at each AKC show, an AKC field representative forwards to the AKC's headquarters a report showing, among other information, the name of the handler of the dog and the owner of the dog. *See* Dk. 44, p. 20. That the owners had contractually agreed with the plaintiffs to handle such dogs could reasonably be

25

inferred. Plaintiffs also show the court an affidavit showing the amount of annual income the plaintiffs have received from dog handling over several recent years.

Plaintiffs cannot maintain an action for tortious interference with a contract where no existing, enforceable contract with anyone has been shown. *See Burcham*, 276 Kan. at 424; *Bushnell Corp. v. ITT Corp.*, 973 F.Supp. 1276, 1288 (D.Kan. 1997) (granting dismissal where plaintiff alleged it had "contractual relations" with its customers and vendors but failed to allege that any particular contract was breached as a result of defendant's conduct.) Here, despite the fact that the defendant had at least constructive notice that the plaintiffs handled dogs for various owners at previous AKC shows, the evidence fails to show any specific contract in effect at the time of the plaintiffs' suspensions which was breached by virtue of defendant's acts.

The same lack of specificity defeats the plaintiffs' claim for tortious interference with prospective business advantage. Among the elements the plaintiffs must show to establish this claim is "the existence of a business relationship or expectancy with the probability of future economic benefit to the plaintiff." *Burcham*, 276 Kan. at 424. The plaintiffs have shown their prior annual business earnings and have projected a corresponding loss of business income as a result of their suspensions, but their burden is to show that they are reasonably certain to recognize an identifiable future economic benefit. *See Meyer Land & Cattle Co. v. Lincoln County Conservation Dist.*, 29 Kan.App.2d 746, 752, 31 P.3d 970, 976 (Kan.App. 2001). Under Kansas law, general conclusory allegations of the type made by the plaintiffs, *i.e.*, potential contracts with unspecified AKC dog owners, are insufficient to show the existence of a business relationship or expectancy with the probability of future economic benefit. *See Meyer*

26

*Land & Cattle Co.*, 29 Kan.App.2d 746 (finding plaintiff's failure to plead specific interference with a particular business relationship, and assertion of general damage to its reputation as a business, was the "sort of general public stigma [that] the tort of defamation is meant to address. ...[the plaintiff] must still plead a specific business expectancy in order to move the claim from the realm of defamation to the realm of tortious interference"); *Vesom v. Atchison Hosp. Ass'n*,  279 Fed.Appx. 624, 640, 2008 WL 2053069, 14 (10th Cir. 2008) (affirming summary judgment under Kansas law where a physician argued that his thriving medical practice was destroyed by the defendants' revocation of his hospital privileges, and offered his own conclusory statements, but failed to submit evidence of interference such as a contract with his patients, or an affidavit identifying even one person who did not engage him due to his loss of privileges at the hospital); *cf., Sunlight Saunas, Inc. v. Sundance Sauna, Inc.*, 427 F.Supp.2d 1032, 1070 -1071 (D.Kan. 2006) (granting summary judgment for the defendant where the plaintiff named some individuals who might have purchased items from the plaintiff, but failed to show that defendants had knowledge of those potential purchasers). The record, read in the light most favorable to the plaintiffs, fails to raise a material question of fact regarding the existence of plaintiffs' existing contracts or prospective business expectancies, and regarding the defendant's knowledge of them.

**Libel**

The plaintiffs additionally claim that as a result of the AKC's publication in its October 2007 edition of the AKC Gazette, the AKC libeled the Plaintiffs, causing economic and reputational injury, and warranting punitive damages. Defendant seeks summary judgment on this claim, contending that no material question of fact has been

27

presented.

Under Kansas law, the elements necessary to prove defamation are "false and defamatory words, communicated to a third person, which result in harm to the reputation of the person defamed." *Hall v. Kansas Farm Bureau*, 274 Kan. 263, 276 (2002). Because the court has found that a qualified privilege applies to the AKC's publication of the notice, the plaintiffs have the additional burden to show not only that the statements were false, but also that the statements were made with actual malice. *See Munsell*, 208 Kan. at 920, 921. Defendant contends that this burden cannot be met, as the evidence shows their statements were both true and non-malicious.

**Falsity**

Plaintiffs allege the notice of their suspensions was false in stating that the plaintiffs had committed acts of cruelty to and neglect of Jag.

Under the law of defamation, no liability exists for true statements. *Ruebke v. Globe Communications Corp.*, 241 Kan. 595, 598, 738 P.2d 1246 (1987). In *Ruebke*, the Kansas Supreme Court held that even substantially true statements are protected:

> [f]or there to be liability for defamation, there must be a publication of a matter that is both defamatory and false. In civil actions for libel where the defendant establishes the truth of the matter charged as defamatory, the defendant is justified in law, and exempt from all civil responsibility. Where the published statements are substantially true, there is no liability.... (citations omitted). Consequently, truth is a complete defense. *High v. A.J. Harwi Hardware Co.*, 115 Kan. 400, 405, 223 P. 264 (1924).

*Lawrence-Leiter*, 963 F.Supp. at 1065 -1066 (finding claims to be "substantially true.") *See Hein v. Lacy*, 228 Kan. 249, 259 (1980) (granting summary judgment for defendant where statements were "substantially true."); *Wilkinson v. Shoney's, Inc.*, 269 Kan. 194, 4 P.3d 1149 (2000) (finding employee's statements that a co-employee had complained

28

about sexual harassment by Wilkinson not to be defamatory because the statements were "in general" truthful despite Wilkinson's claim of innocence.)

Here, the statements published in the notice of the plaintiffs' suspensions are at least technically or substantially true. The notice states that the AKC heard charges against Mr. Dennis Snyder for cruelty and neglect, sustained those charges and suspended him for the stated period. Similarly, the notice states that the AKC heard charges against Audra Snyder for cruelty, sustained those charges and suspended her for the stated period. Those facts accurately reflect the actions taken by the AKC. *Cf Turner*, 240 Kan. at 14 (finding no malice as necessary for defamation and tortious interference claims where plaintiff's ex-employer told plaintiff's prospective employer that plaintiff had been terminated for stealing company property, because the statement was "technically true."); *Smith-Utter v. Kroger Co.*, 2009 WL 790183, 4 (D.Kan. 2009); *Rodger v. American Kennel Club*, 138 Misc. 310, 318, 245 N.Y.S. 662, 672 (N.Y.Sup. 1930) (finding a report of the AKC's trial board finding a person guilty of misconduct and suspending him to be true, qualifiedly privileged, and non-malicious). Plaintiffs have failed to raise a material question of fact that any statement made in either notice was false.

### Malice

Plaintiffs further contend that "the relationship between the principal staff investigator and one of the AKC's field representatives shows actual malice sufficient to overcome any qualified privilege that may exist." The court has already addressed this contention, and has found no evidence that the alleged relationship had any impact upon the AKC's decision in this matter. Even assuming, *arguendo,* that the notices are

29

false, the publication is entitled to a qualified privilege.

The court reviews the same evidence as previously discussed, and reads it in the light most favorable to the plaintiffs, but finds that no material question of malice has been raised. *See Turner*, 240 Kan. at 14; *Rodger*, 245 N.Y.S. at 672; *Abbott*, 2000 WL 913953 at *10; *Redgate*, 61 Kan. 480.

### Damages

Under Kansas law, a plaintiff in a defamation action cannot rest on presumed damages, but must prove damages. "The plaintiff must show how his or her true reputation in the community of his or her residence has been affected." *Lindemuth v. Goodyear Tire and Rubber Co.*,19 Kan.App.2d 95, 103, 864 P.2d 744 (1993). The record fails to include any affidavit or other evidence raising a material question of fact on this element. For all the reasons set forth above, summary judgment in defendant's favor is warranted on the plaintiffs' libel claim.

**Collateral estoppel/res judicata**

The plaintiffs additionally contend that the AKC's charges of cruelty are barred by collateral estoppel and res judicata by virtue of the owner's suit against the Snyders in state court.[8] Plaintiffs contend that the owner's suit claimed only negligence, that the suit was settled with prejudice, that no cruelty was alleged, and that the elements of collateral estoppel are met.

Federal courts must "accept the [preclusion] rules chosen by the State from which the judgment is taken." *Marrese v. American Academy of Orthopaedic Surgeons*,

---

[8]Defendant does not claim that the AKC's finding has any preclusive effect on this suit.

470 U.S. 373, 380,105 S.Ct. 1327, 84 L.Ed.2d 274 (1985). The Court will therefore look to Kansas collateral estoppel law to determine whether the Foneca settlement should have preclusive effect here.

Collateral estoppel "prevents a second litigation of the same issues between parties or their privies." *In re Estate of Beason*, 248 Kan. 803, 813, 811 P.2d 848 (1991). Under Kansas law, three elements must be satisfied for collateral estoppel to apply: (1) a prior judgment on the merits which determined the rights and liabilities of the parties on the issue based upon ultimate facts as disclosed by the pleadings and judgment; (2) the parties must be the same or in privity; and (3) the issue litigated must have been determined and necessary to support the judgment. *Id.* The Court presumes that the settlement agreement entered into in state court by the plaintiffs and Janice Fonceca was approved by the court and journalized, so that it constitutes a final judgment on the merits. *See Honeycutt by and through Phillips v. City of Wichita*, 251 Kan. 451, 458 (1992). The other two requirements are not met, however, as a matter of law.

The AKC is not the same party as the owner, Janice Fonceca, nor are those two in privity. The Kansas Supreme Court defines privity narrowly. The existence of privity depends upon the circumstances of each case. A privy is:

> "(O)ne who, after rendition of the judgment, has acquired an interest in the subject matter affected by the judgment through or under one of the parties, as by inheritance, succession, or purchase." *Bernhard v. Bank of America*, 19 Cal.2d 807, 811, 122 P.2d 892, 894 (1942). *See also Goetz v. Board of Trustees*, 203 Kan. 340, 454 P.2d 481 (1969).

*Wells v. Davis*, 226 Kan. 586, 589, 603 P.2d 180 (1979). That the owner and the AKC share an interest in the same facts is insufficient to show privity.

31

> "Privity is not established however, from the mere fact that persons happen to be interested in the same question or in proving or disproving the same state of facts, or because the question litigated was one which might affect such other person's liability as a judicial precedent in a subsequent action...."

*St. Paul Fire and Marine Ins. Co. v. Tyler*, 26 Kan.App.2d 9, 18, 974 P.2d 611, 618 (Kan.App 1999) quoting 47 Am.Jur.2d, Judgments § 663. In the present case, the two parties do not share the same interest, as the owner's interest was to recover damages for the loss of her dog, but the AKC's interest was to regulate and discipline conduct prejudicial to the best interests of purebred dogs. This lack of privity defeats not only collateral estoppel, but also res judicata. *See Wells*, 226 Kan. at 603; *Williams v. Evans*, 220 Kan. 394, 396, 552 P.2d 876 (1976).

Additionally, the record establishes that the issue of cruelty was not determined in the Fonceca suit. Three claims were made, two were dismissed, and the third, which settled, solely alleged negligence. "The use of collateral estoppel also requires the issue brought against the parties in the second suit must have been adjudicated in the first action even though the claim is different. *Williams v. Evans*, 220 Kan. at 396, 552 P.2d 876." *Wells*, 226 Kan. at 589. The issue of cruelty was not adjudicated in the Fonceca action, and no collateral estoppel on the issue of negligence is sought. This defeats plaintiffs' claim of res judicata as well, which requires that the claim or cause be identical. See *Goetz v. Board of Trustees*, 203 Kan. at 349.

IT IS THEREFORE ORDERED that the plaintiffs' motion for partial summary judgment (Dk. 44) is denied, that the defendant's motion to dismiss the second amended complaint (Dk. 40) is denied, and that defendant's alternative motion for summary judgment (Dk. 40) is granted.

Dated this 6th day of October, 2009, Topeka, Kansas.


s/ Sam A. Crow
Sam A. Crow, U.S. District Senior Judge